1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARIA PEREZ,

11              Plaintiff,                        No. CIV S-09-0628 GGH

12         vs.

13
     MICHAEL J. ASTRUE,                           ORDER
14   Commissioner of
     Social Security,
15
                Defendant.
16   _____/

17              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI")

19   and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social

20   Security Act ("Act").   For the reasons that follow, Plaintiff's Motion for Summary Judgment is

21   DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the

22   Clerk is directed to enter judgment for the Commissioner.

23   BACKGROUND

24              Plaintiff, born June 20, 1951, applied on May 16, 2006 for disability benefits.  (Tr.

25   at 53, 58.)  Plaintiff alleged she was unable to work due to osteoarthritis and "sprains and strains

26   - all types."  (Id.)  In a decision dated May 28, 2008, ALJ William C. Thompson, Jr. determined

that plaintiff was not disabled.  (Id. at 8-18.)   The ALJ made the following findings:[1]

    1.     The claimant met the insured status requirements of the Social Security Act only through December 31, 2006.

    2.     The claimant has not engaged in substantial gainful activity since January 1, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.).*

    3.     The claimant has the following severe impairments: Arthritis in hands, and depression (20 CFR 404.1520(c) and 416.920(c)).

    4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    5.     After careful consideration of the entire record, I find that

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

       Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

       Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

       Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

       Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

       Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

    The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). She is able to lift 50 pounds occasionally, 25 pounds frequently, and is able to stand and walk in combination for six hours out of an eight-hour workday. She is able to sit without limitation when not required to stand or walk. She is limited to work that requires frequent but not constant bilateral hand usage.

6.   The claimant is capable of performing past relevant work as a packing machine operator and industrial cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant is unable to perform past relevant work as a sorter (20 CFR 404.1565 and 416.965).

8.   The claimant was born on June 20, 1951 and was 50 years old, which is defined as an individual "closely approaching advanced age," on the alleged disability onset date (20 CFR 404.1563 and 416.963).[2]

9.   The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English.

10.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, even if she were unable to perform her past work (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

\\\\\

\\\\\

---

[2]   The undersigned is sure that plaintiff was at one time 50 years old; however, at the time of the hearing, plaintiff was 57 years old. Even if the time of application were used (2006), plaintiff was 55. For SSI purposes, the date of onset is not very important in that benefits would commence, if at all, from the date of the application (or later if a later onset date were chosen). Even for SSA benefits, payment can only be retroactive to a year before the application was filed regardless of the onset date. In many cases, this mistake of age would be significant, but given the types of disabilities alleged here, and the fact that the Grids were not used, the error in ascribing plaintiff's age is not significant.

3

1           12.    The claimant has not been under a disability, as defined in
                 the Social Security Act, from January 1, 2002 through the
2                  date of this decision (20 CFR 404.1520(g) and 416.920(g)).

3 (Tr. at 10-18.)

4 ISSUES PRESENTED

5         Plaintiff has raised the following issues: A.  Whether the ALJ Failed to  Develop

6 the Record Regarding Plaintiff's Mental Impairment and Order an Updated Psychiatric

7 Consultative Exam; B.  Whether the ALJ Failed to Accurately Characterize the Medical

8 Evidence and Credit the Opinions of Treating Mental Health Specialists Without a Legitimate

9 Reason; and C.  Whether the ALJ Failed to Credit Plaintiff's Testimony and Third Party

10 Statements Regarding Plaintiff's Functional Limitations.

11 LEGAL STANDARDS

12         The court reviews the Commissioner's decision to determine whether (1) it is

13 based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

14 the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

15 Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

16 Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

17 as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

18 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

19 is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

20 ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

21 "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

22 rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

23 ANALYSIS

24     A.  Whether the ALJ Failed to  Develop the Record Regarding Plaintiff's Mental

25 Impairment and Order an Updated Psychiatric Consultative Exam

26         Plaintiff contends that the ALJ should have sought a more recent consultative

1  mental exam because the evaluation done by Dr. Daigle was performed in 2006, and plaintiff's

2  mental health deteriorated after that time.

3          Disability hearings are not adversarial.  Dixon v. Heckler, 811 F.2d 506, 510 (10th

4  Cir. 1987) (holding that ALJ has basic duty to "inform himself about facts relevant to his

5  decision") (quoting Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983) (Brennan, J.,

6  concurring)).  The ALJ must fully and fairly develop the record, and when a claimant is not

7  represented by counsel, an ALJ must be "especially diligent in exploring for all relevant facts."

8  Tonapetyan v. Halter, 242 F.3d 1144 (9th Cir. 2001).[3]  The duty also is heightened in the case of

9  a mentally ill claimant who may not be able to protect him or herself.  Id.

10         Evidence raising an issue requiring the ALJ to investigate further depends on the

11  case.  Generally, there must be some objective evidence suggesting a condition which could have

12  a material impact on the disability decision.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th

13  Cir.1996); Wainwright v. Secretary of Health and Human Services, 939 F.2d 680, 682 (9th

14  Cir.1991).  "Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate

15  inquiry.'"  Tonapetyan, 242 F.3d at 1150 (quoting Smolen, 80 F.3d at 1288.)  The ALJ's decision

16  may be set aside due to his failure to develop the record if the claimant can demonstrate prejudice

17  or unfairness as a result of said failure.  Vidal v. Harris, 637 F.2d 710, 713 (9th Cir. 1991).  Thus,

18  the Ninth Circuit places the burden of proving prejudice or unfairness on the claimant.

19         The ALJ can develop the record by (1) making a reasonable attempt to obtain

20  medical evidence from the claimant's treating sources, (2) ordering a consultative examination

21  when the medical evidence is incomplete or unclear and undermines ability to resolve the

22  disability issue; (3) subpoenaing or submitting questions to the claimant's physicians; (4)

23  continuing the hearing; or (5) keeping the record open for supplementation.  See Tonapetyan, 242

24  F.3d. at 1150; 20 C.F.R. 404.1517, 416.917; 42 U.S.C. § 423(d)(5)(A), (B).  Ordering a

25

26         [3]  See also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir.1996) (ALJ has duty to develop the record even when claimant is represented).

1  consultative examination ordinarily is discretionary, see Wren v. Sullivan, 925 F.2d 123, 128

2  (5th Cir.1991); Jones v. Bowen, 829 F.2d 524, 526 (5th Cir.1987), and is required only when

3  necessary to resolve the disability issue.  See Reeves v. Heckler, 734 F.2d 519, 522 (11th

4  Cir.1984); Turner v. Califano, 563 F.2d 669, 671 (5th Cir.1977).

5          The ALJ has a duty to develop the record if the evidence is ambiguous, however,

6  in this case, the ALJ did not find any ambiguity with respect to the mental health issues that

7  required further inquiry.  The ALJ gave significant weight to the consultative exam performed by

8  Dr. Daigle on August 16, 2006.  Prior to that time, although plaintiff stopped working in 2004,

9  she had not received any mental health treatment.  After this exam, she also did not receive any

10  mental health treatment until July, 2007.  In fact, the ALJ's decision, dated May 28, 2008, was

11  issued less than a year after plaintiff first sought mental health treatment.  (Tr. at 304-11.)

12          Plaintiff informed Dr. Daigle that she had never really received mental health

13  treatment.  (Id. at 256-57.)  Plaintiff related that she had taken medication for depression three

14  years earlier and felt "a lot better," but stopped taking it after two months.  She could not explain

15  why she did not continue medication or treatment.  (Id. at 257.)  At this consultation, plaintiff

16  was "alert, expressive, composed, and seemed to have [quite a] sense of humor."  (Id. at 258.)

17  This psychiatrist diagnosed adjustment disorder with depressed mood, mild; no psychiatric

18  diagnosis.  Psychosocial stressors were mild.  GAF score at that time was 65.[4]  Dr. Daigle

19  recorded plaintiff's opinion that her depression was mild, and that she had not really undergone

20  any treatment for it.  He then opined that "[t]his appears to be a motivational problem more than

21  anything else."  He concluded that she could be employed in a "low demand, low stress

22

23          [4] GAF is a scale reflecting the "psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental

24  Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, A GAF of 61-70 indicates
"some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social,

25  occupational, or school functioning (e.g., occasional truancy, or theft within the household), but
generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV at

26  32.

position."  In regard to her functional capacity, Dr. Daigle found that plaintiff was not

significantly limited in being able to follow simple one or two step instructions, but that she was

slightly limited in her ability to follow complex instructions.  She was also only slightly limited

in other areas, such as interacting with supervisors and coworkers, maintaining attention and

concentration, persistence and pace, and day to day work activity.  She was slightly to moderately

limited in being able to adapt to stresses in a normal work environment.  (Id. at 260.)

Dr. Daigle did not have any mental health records for review, however, this fact is

of no consequence as there were no mental health records prior to this time, other than records

reflecting prescriptions for medications such as Paxil and Lexapro[5], but no treatment.  (Tr. at

198, 224, 236, 228, 229.)  Plaintiff herself related this same information to Dr. Daigle and he

found that she was a reliable historian.  (Tr. at 256.)

It is true that plaintiff had received prescriptions for anti-depressants since 2002;

however, her condition apparently was not severe enough to warrant referral for mental health

treatment until 2007.[6]  (Id. at 236.)  In July, 2007, plaintiff began treatment at San Joaquin

Mental Health.  Plaintiff was treated by Judith Dolyniuk, a marriage and family therapist intern.

At the initial intake on July 24, 2007, plaintiff was diagnosed with major depressive disorder,

severe, with psychotic features, and anxiety.  Her GAF was 40,[7] and her highest GAF in the past

year was 40, even though this MFT had no records of any prior treatment and this determination

---

[5]  Plaintiff was taking a very low dose of Lexapro, 10 mg. per day, which is considered a starting dose.  Http://en.wikipedia.org.

[6]  Plaintiff did go to the emergency room in 2006 for depression and "not acting normal," but was diagnosed only with stress, and sent home to rest and take Tylenol or Advil.  She was to avoid alcohol.  (Id. at 205-06.)

[7]  According to the DSM IV, A GAF of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM IV at 34.

1    was made at the initial intake.  (Id. at 310.)

2            As the ALJ pointed out, this GAF score was just a snapshot of plaintiff's

3    condition on that date, and there was no evidence that her condition had deteriorated over time.

4    (Id. at 15.)  Plaintiff was treated by this intern until at least February, 2008, when the records

5    were submitted to the Commissioner.  They reveal that plaintiff 's condition improved with

6    treatment and medication, just as the ALJ concluded.  (Id. at 16.)  For example, on November 16,

7    2007, treating notes indicate that plaintiff ran out of medication and stopped taking it for two

8    weeks at a time, which led to a "recent depressive and 'dark' episode."  (Id. at 291.)  The intern

9    concluded that plaintiff was "benefitting from regular use of medications."  (Tr. at 291.)  A

10   condition which can be controlled or corrected by medication is not disabling.  See Montijo v.

11   Secretary of HHS, 729 F.2d 599, 600 (9th Cir.1984) (Addison's Disease controlled with

12   medications deemed not disabling); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (rib

13   condition controlled with antibiotics not considered disabling).  Plaintiff also reported that

14   receiving therapy sessions helped her mood.  (Id. at 291.)  Other therapy sessions revealed that

15   plaintiff's condition worsened only when she stopped taking her medications.  On November 1,

16   2007, plaintiff reported that she had not picked up her refill for two weeks and was very

17   depressed that week.[8]  (Id. at 292.)  As therapy progressed, plaintiff reported a few times that the

18   medications and therapy sessions were helping.  (Id. at 293, 294, 295.)

19           The ALJ discussed the aforementioned problems to conclude that no further

20   development of the record was necessary and that the evidence presented was sufficient to make

21   a determination.  The report of Dr. Daigle was issued approximately one and a half years before

22   the administrative hearing, and was not too remote in time, as plaintiff suggests.  As discussed

23   above, the evidence concerning medication and therapy revealed that plaintiff was prescribed

24   anti-depression and anti-anxiety medication, which made her feel better when she took her

25

26           [8]  Even when plaintiff was prescribed psychiatric medication years earlier, she would stop
     taking it on her own.  (Id. at 224.)

                                                    8

1 medication regularly, but she did not seek therapeutic treatment until July, 2007.  Nearly the

2 whole of the record before the ALJ demonstrated no severe mental health issues, except Ms.

3 Dolyniuk's opinion which was not supported by the remainder of the evidence.

4          Ultimately, there was not sufficient ambiguity with respect to the mental health

5 evidence and there was sufficient evidence in the record to permit the ALJ to render a proper

6 decision without ordering a further consultation.  While the ALJ must fully and fairly develop the

7 record where appropriate, the burden of proving disability is on plaintiff.  Bayliss v. Barnhart,

8 427 F.3d 1211, 1217 (9th Cir. 2005).  The undersigned is not finding that plaintiff's claim here is

9 unsupportable.  The evidence could be viewed as showing that plaintiff significantly

10 decompensated during 2007 making the 2006 evaluation not pertinent for a later onset date.

11 However, the evidence could also be viewed as showing a plaintiff who decompensated when

12 she was not taking her medication, and when she was taking it – was not disabled.  The ALJ

13 made a reasonable choice based on the evidence of record.

14     B.  Failure to Credit the Opinions of Treating Mental Health Specialists

15          Plaintiff contends that the ALJ failed to accurately characterize the medical

16 evidence and credit the opinions of plaintiff's treating mental health specialists.

17          The weight given to medical opinions depends in part on whether they are

18 proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

19 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[9]  Ordinarily,

20 more weight is given to the opinion of a treating professional, who has a greater opportunity to

21 know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

22

23          [9]  The regulations differentiate between opinions from "acceptable medical sources" and
"other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed
24 psychologists are considered "acceptable medical sources," and social workers are considered
"other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status
25 when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific
regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
26 accordingly are given less weight than opinions from "acceptable medical sources."

1    Cir. 1996).

2          To evaluate whether an ALJ properly rejected a medical opinion, in addition to

3    considering its source, the court considers whether (1) contradictory opinions are in the record;

4    and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of

5    a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester ,

6    81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may

7    be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

8    professional's opinion generally is accorded superior weight, if it is contradicted by a supported

9    examining professional's opinion (supported by different independent clinical findings), the ALJ

10   may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

11   Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

12   weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

13   2001),[10] except that the ALJ in any event need not give it any weight if it is conclusory and

14   supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

15   (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

16   881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

17   insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

18          It is true, as plaintiff asserts, that the ALJ gave significant weight to the

19   consultative opinion of Dr. Daigle.  He explained why he was according less weight to the

20   treating source, MFT intern Dolyniuk.  First, even after being evaluated by Dr. Daigle, plaintiff

21   did not seek mental health treatment until almost a year later.  (Tr. at 15.)  Plaintiff asserts that

22   her depression was diagnosed as far back as 2002.  This may be true; however, it was not severe

23   enough to warrant therapy until 2007.  Dr. Daigle's finding of a GAF score of 65 in 2006

24

25        [10]  The factors include: (1) length of the treatment relationship; (2) frequency of
     examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
26   (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1   establishes that plaintiff's depression was not severe at that time, although she had been taking

2   prescription depression medications on and off since 2002.  To the extent that her depression

3   may have been severe, it was certainly controlled by medication in 2006 at the time of the

4   evaluation.

5            Plaintiff also contends that her GAF score was found to be 39 or 40 on a few

6   occasions between June and August, 2007, and was not just a snapshot as found by the ALJ.  The

7   scores during this short three month period do not establish severity over a continuous twelve

8   month period.  Dr. Daigle assessed a score of 65 one year earlier, in August, 2006.  (Id. at 260.)

9   Plaintiff's condition improved after August, 2007, with therapy and medication.  (Tr. at 291-93.)

10   It appears that plaintiff's condition worsened when she did not take her medication for a few

11   weeks, and at the time she was assessed with a GAF of 39, she was not taking any prescription

12   medication.  (Tr. at 300, 303.)  Furthermore, the GAF scores are not entirely reliable as Ms.

13   Dolyniuk noted a "highest GAF past year" score of 40 when plaintiff had not even seen this

14   practitioner prior to the date of this notation, and the practitioner had no earlier records.  (Id. at

15   310.)  At the administrative hearing on March 12, 2008, plaintiff's friend testified that plaintiff's

16   treatment was "helping her a little bit."  (Id. at 43-44.)  Furthermore, a low GAF score does not

17   alone determine disability, but is a piece of evidence to be considered with the rest of the record.

18   Olds v. Astrue, 2008 WL 339757, at *4 (D. Kan. Feb. 5, 2008) (citation omitted).  As pointed out

19   by the Commissioner, the GAF scale does not have a direct correlation to the severity

20   requirements in the listings of mental disorders.  65 Fed. Reg. 50746, 50764-65 (2000).  An ALJ

21   is permitted to discredit a GAF score where it is unsupported by objective evidence.  Clark v.

22   Astrue, 2009 WL 542166, *6 (C.D. Cal. 2009).

23            Plaintiff also suggests that treatment notes subsequent to July 2007 indicate the

24   severity of her condition.  First, the ALJ was free to accord this evidence less weight because it

25   was rendered by a Marriage and Family Therapist intern, a non-acceptable medical source.  The

26   regulations differentiate between opinions from "acceptable medical sources" and "other

1   sources." <u>See</u> 20 C.F.R. §§ 404.1513 (a),(d); 416.913 (a), (d).  For example, licensed

2   psychologists are considered "acceptable medical sources," and therapists are considered "other

3   sources." <u>Id.</u>  Medical opinions from "acceptable medical sources," have the same status when

4   assessing weight.  <u>See</u> 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific

5   regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"

6   accordingly are given less weight than opinions from "acceptable medical sources."

7          Second, the therapist's notes regarding the severity of plaintiff's condition are

8   based for the most part on plaintiff's subjective complaints.  "An ALJ may reject a treating

9   physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been

10  properly discounted as incredible." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008)*,*

11  *(citing* <u>Morgan v. Comm'r Soc. Sec. Admin.</u>, 169 F.3d 595, 602 (9th Cir. 1999) (*citing* <u>Fair V.</u>

12  <u>Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989)).  Furthermore, "the ALJ is the final arbiter with

13  respect to resolving ambiguities in the medical evidence."  <u>Id.</u>

14         Furthermore, the ALJ was not required to rely on the therapist intern's opinion

15  that plaintiff "does not appear able to focus or concentrate enough to work and be safe."  (<u>Id.</u> at

16  290.)  "A statement by any physician that the claimant is disabled or unable to work is a

17  conclusion on the ultimate issue to be decided . . . and is not binding on the [ALJ] in reaching his

18  determination as to whether the claimant is disabled within the meaning of the [Act]."  <u>Murray v.</u>

19  <u>Heckler</u>, 722 F.2d 499 (9th Cir. 1983), (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335 (9th Cir. 1988),

20  20 C.F.R. §§ 404.1527 and 404.927); <u>accord</u>, <u>Magallanes v. Bowen</u>, 881 F.2d 747, 750-51 (9th

21  Cir. 1989).  Moreover, this statement by Ms. Dolyniuk is not consistent with the lesser severity of

22  symptoms presented and the minimum level of treatment rendered.

23         Within her discussion of the issue concerning failure to credit the treating

24  therapist's opinion, plaintiff contends that the ALJ's hypothetical to the VE did not even include

25  Dr. Daigle's limitations of being not significantly limited in following simple one or two step

26  instructions, slightly limited in following complex instructions, slightly limited in interacting

1  with supervisors and coworkers, maintaining attention and concentration, persistence and pace,

2  and day to day work activity, and slightly to moderately limited in being able to adapt to stresses

3  in a normal work environment.  (Id. at 260.)

4          The vocational expert found that plaintiff could do the jobs of packing machine

5  operator and industrial cleaner, both of which carried a reasoning level of two and are medium

6  work.  A level "2" denotes:

7          Apply common sense understanding to carry out detailed but uninvolved written
          or oral instructions.  Deal with problems involving a few concrete variables in or
8          from standardized situations.

9  DICOT, App. C.

10          It is tempting to just substitute the language in the hypothetical with the precise

11  language in the DOT, but fashioning a decision on simplicity alone here would turn out to be

12  wrong.  Rather than adhere to a strict construction of what this limitation equates to in terms of

13  reasoning level, this court prefers to follow the well developed reasoning of the Central District

14  in Meissl v. Barnhart, 403 F. Supp.2d 981 (C.D. Cal. 2005).  There, the plaintiff was found to be

15  limited to "simple tasks performed at a routine or repetitive pace."  Id. at 982.  The court

16  explained that although the Social Security Regulations contained only two categories of abilities

17  in regard to understanding and remembering instructions, either "short and simple" and

18  "detailed" or "complex," the DOT had many more gradations for measuring this ability, and

19  there were six gradations altogether.  Id. at 984.  For example, level 2 requires application of

20  "commonsense understanding to carry out detailed but uninvolved written or oral instructions.

21  Deal with problems involving a few concrete variables in or from standardized situations."

22  DICOT, App. C.  The court continued:

23          To equate the Social Security regulations use of the term "simple" with its use in
          the DOT would necessarily mean that all jobs with a reasoning level of two or
24          higher are encapsulated within the regulations' use of the word "detail."  Such a
          "blunderbuss" approach is not in keeping with the finely calibrated nature in
25          which the DOT measures a job's simplicity.

26  Meissl, 403 F. Supp.2d at 984.

1    Furthermore, the use of the term "uninvolved" along with the term "detailed" in

2   the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the

3   term "detailed" with the DOT's use of that term.  Id.  The court found that the plaintiff's RFC

4   must be compared with the DOT's reasoning scale.  A reasoning level of one requires slightly

5   less than simple tasks that are in some sense repetitive.  For example, they include the job of

6   counting cows as they come off a truck.  A reasoning level of two would encompass an RFC of

7   being able to do "simple and repetitive work tasks."  Id.

8    In this case, it is clear that plaintiff's mental limitations are not of the sort limited

9   to counting cows that come off trucks, i.e., the job requirement of *less than* simple, repetitive

10   abilities.  Rather, plaintiff can act in simple situations with repetitive patterns.  Thus, both jobs

11   are within plaintiff's abilities.  Because plaintiff can perform both of the jobs attributed to her by

12   the vocational expert, there is no cause to find in plaintiff's favor.

13    C.  Whether the ALJ Failed to Credit Plaintiff's Testimony and Third Party Statements

14   Regarding Plaintiff's Functional Limitations

15    1.  Plaintiff's Testimony

16    Plaintiff contends that the ALJ rejected her credibility without clear and

17   convincing reasons.

18    The ALJ determines whether a disability applicant is credible, and the court defers

19   to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

20   94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

21   credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

22   Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

23   supported by "a specific, cogent reason for the disbelief").

24    In evaluating whether subjective complaints are credible, the ALJ should first

25   consider objective medical evidence and then consider other factors.  Vasquez v. Astrue, 572

26   F.3d 586, 591 (9th Cir. July 8, 2009);  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en

14

banc).  The ALJ may not find subjective complaints incredible solely because objective medical

evidence does not quantify them.  Bunnell at 345-46.  If the record contains objective medical

evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature

of the alleged symptoms, including aggravating factors, medication, treatment, and functional

restrictions.  See Vasquez, 572 F.3d at 591.  The ALJ also may consider the applicant's: (1)

reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately

explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily

activities.[11]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61

FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party

testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony

and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792

(9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han

v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.

Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that

her impairment "could reasonably have caused some degree of the symptom."  Vasquez, 572

F.3d at 591 (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80

F.3d at 1282).  Absent affirmative evidence demonstrating malingering, the reasons for rejecting

applicant testimony must be specific, clear and convincing.  Vasquez, 572 F.3d at 591.

        Plaintiff's credibility was properly questioned for the reasons pointed out by the

ALJ.  He first reviewed the medical evidence and compared it to plaintiff's complaints but

concluded that although plaintiff had polyarthralgia caused by rheumatoid arthritis and possibly

osteoarthritis, she could work with some limitation in handling and fingering only.  (Tr. at 13-

---

[11]  Daily activities which consume a substantial part of an applicants day are relevant.
"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
any way detract from her credibility as to her overall disability.  One does not need to be utterly
incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
(quotation and citation omitted).

14.)  Despite plaintiff's complaints of pain and numbness in her hands, the ALJ noted that plaintiff did not receive treatment for her bilateral carpal tunnel syndrome after the initial diagnosis in 2002.  Plaintiff was treated with Naprosyn, but surgery or other therapy was not recommended.  (Id. at 14.)  The ALJ discussed plaintiff's medical history, noting that although she had been treated for various complaints of pain over the years, no doctor thought she was unable to work.  Her symptoms were mild and temporary, and treatment was not recommended for her physical ailments.  (Id.)  In fact, as pointed out by the Commissioner, plaintiff denied taking pain medication on various occasions, and confirmed this statement at the hearing.  (Id. at 36.)  See (Tr. at 216) ("she does not use aspirin or NSAIDs with any regularity" ); (tr. at 253, 257) (plaintiff reported to Drs. Seu and Daigle that she only took Tylenol for pain).

The ALJ also noted perceived inconsistencies in plaintiff's statements regarding her ailments and pain, which plaintiff disputes.  (Tr. at 15.)  Even assuming that plaintiff's various reports of daily activities could be read as consistent with each other, the ALJ's other reasons for questioning her credibility cannot be disputed.  Dr. Seu, a consulting surgeon, found that plaintiff had no physical limitations other than "difficulty with repetitive motion work with her hands, due to arthritis." (Id. at 255.)  Dr. Daigle, as discussed in the previous sections, found plaintiff's mental health to be normal.  (Id. at 15.)  The ALJ noted that plaintiff did not seek mental health treatment until 2007, a year after Dr. Daigle's report.  The treatment notes indicate that plaintiff felt worse when she stopped taking her prescriptions for depression, but improved when she followed her medication regimen.  (Id. at 16.)

The ALJ summed up the discussion by pointing to plaintiff's work history which indicated that she was not disabled.  He noted that she claimed disability as of 2002, and showed no earnings that year or in 2003.  Plaintiff returned to work in 2004, earning $7,150 that year, but the medical evidence did not show any improvement in her condition from 2001, when she stopped working, to 2004, when she apparently felt well enough to work.  Nor is there any medical evidence showing a deterioration in her condition in 2004 which would have caused her

16

1  to stop working at that time, which she did.  The ALJ correctly concluded from these facts that

2  there was no supporting medical evidence indicating that plaintiff could not work.  (Id. at 16.)

3  The ALJ gave clear and convincing reasons in support of his credibility analysis,

4  which is supported by the record.

5  2.  Third Party Testimony

6  Plaintiff's final assertion is that the ALJ did not properly consider the lay opinion

7  of Irene Almenearez, plaintiff's long time friend, who testified regarding plaintiff's temperament

8  and difficulty in getting along with people, as well as her functional limitations.

9  An ALJ is required to "consider observations by non-medical sources as to how

10  an impairment affects a claimant's ability to work."  Sprague v. Bowen, 812 F.2d 1226, 1232

11  (9th Cir. 1987).  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ

12  must take into account, unless he or she expressly determines to disregard such testimony and

13  gives reasons germane to each witness for doing so."  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir.

14  2001) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).  Similar to the ALJ's role

15  in evaluating the testimony of a claimant, when evaluating the testimony of a lay witness "[t]he

16  ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for

17  resolving ambiguities."  Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting

18  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

19  The Ninth Circuit has held that the ALJ must properly discuss lay witness

20  testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully

21  crediting the testimony, could have come to a different disability determination.  Stout v.

22  Commissioner, 454 F.3d 1050 (9th Cir. 2006).  This standard is extremely high and rivals, if not

23  surpasses, the Chapman harmless error standard in criminal law (error harmless only if no

24  reasonable doubt about its lack of effect).

25  Plaintiff objects to the ALJ's consideration of this testimony, arguing that he only

26  briefly summarized it and summarily concluded that it and plaintiff's testimony were not

1  credible, without providing reasons specific and germane to each witness.  Here, the ALJ

2  described Ms. Almenearez's testimony and stated that he had considered it; however, he rejected

3  it for the same reasons that he discounted plaintiff's credibility.  (Tr. at 13.)  <u>See</u> discussion

4  *supra*.  Because his reasons applied equally to plaintiff and to Ms. Almenearez, he was not

5  required to repeat each reason separately.  The undersigned has already found that these reasons

6  are clear and convincing and supported by substantial evidence.

7  <u>CONCLUSION</u>

8           For the reasons stated herein, IT IS ORDERED that: plaintiff's Motion for

9  Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is

10 granted, and judgment is entered for the Commissioner.

11 DATED: 01/03/2011

12                                              /s/ Gregory G. Hollows

13                                              _____
                                                GREGORY G. HOLLOWS
14 GGH/076                                      U.S. MAGISTRATE JUDGE
   Perez0628.ss.wpd

15

16

17

18

19

20

21

22

23

24

25

26